Lena N. Bacani (SBN 213556)
lena.bacani@lozaip.com
LOZA & LOZA, LLP
305 N. Second Ave., Ste. 127
Upland, CA 91786
Telephone: (877) 406-5164
Facsimile: (213) 394-3625

Attorneys for Defendant
NEUROPACE, INC.

# IN THE UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DILORENZO BIOMEDICAL, LLC, a Washington limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> NEUROPACE, INC., a California corporation, <br><br> Defendant. | Case No. 5:25-cv-04866-EKL <br><br> **NEUROPACE, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL STANDARD ......................................................................................... 1

III.  ARGUMENT .................................................................................................... 3

    A. stimulating and recording unit constructed and arranged to generate said neural modulation signal based upon a neural response sensed by said at least one sensor in response to a previously delivered neural modulation signal ('787 patent, claim 1)…….3

    B. control module for adjusting said neural modulation signal based upon said neural system state ('787 patent, claim 3)………………..………………………………………3

        *1. This is a Means-Plus-Function Term*………………………………… …………..4

        *2. Function and Corresponding Structure*…………………..………………….…..5

    C. means for monitoring parameters that are indicative or predictive of a seizure ('787 patent, claim 7)…………………………………………………………..………….8

    D. controller means for modulating parameters of a subsequent neural modulation signal based on the sensed neural response to a previously delivered neural modulation signal ('787 patent, claim 7)………………………………………………..………….12

    E. signal processing means for processing said conditioned sensed neural response signals to determine neural system states ('787 patent, claim 8)………………………… …..…..12

    F. sympathetic nervous system ('880 patent, claim 59)………………………………14

    G. neural state of a component of the sympathetic nervous system ('880 patent, cl. 59)....16

    H.  representative of affect ('880 patent, claim 59)………………………………..20

    I.  configured to generate a signal to modulate affect ('880 patent, claim 59)….………...21

    J. a stimulating electrode array configured to interface with a component of the sympathetic nervous system ('880 patent, claim 59)………………………………………….……22

IV.   CONCLUSION .............................................................................................. 23

**TABLE OF AUTHORITIES**

*American Permahedge, Inc. v. Barcana, Inc.*, 105 F.3d 1441 (Fed. Cir., 1997) ........................ 25

*Amgen Inc. v. Coherus Biosciences Inc.,* 931 F.3d 1154 (Fed. Cir. 2019) ................................. 17

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Technologies,* 521 F.3d 1328 (Fed. Cir. 2008)..... 7

*B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed.Cir.1997) ........................................... 6

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co., KG,* 224 F.3d 1308 (Fed. Cir. 2000). 11

*Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314 (Fed. Cir. 2016)..................... 2

*Ergo Licensing, LLC v. CareFusion 303, Inc.,* 673 F.3d 1361 (Fed. Cir. 2012) ........................... 6

*Fenner Inv., Ltd. v. Cellco P'ship,* 778 F.3d 1320 (Fed. Cir. 2015) ............................................. 3

*In re Donaldson Co., Inc.,* 16 F.3d 1189 (Fed. Cir. 1994) ........................................................... 8

*Intel Corp. v. Qualcomm Inc.,* 21 F.4th 801 (Fed. Cir. 2021) .................................................... 11

*Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533 (Fed.Cir.1991) ................................................ 15

*Libel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898 (Fed. Cir. 2004) ............................................ 8

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed. Cir. 1995) ........................................ 1

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303 (Fed. Cir. 2001)............ 15

*MTD Prods. Inc. v. Iancu,* 933 F.3d 1336 (Fed. Cir. 2019) .......................................................... 5

*Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302 (Fed.Cir.2012) .................................................. 6, 7

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co., Ltd.* 521 F.3d 1351 (Fed. Cir. 2008) .......... 2

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ..................................................... 2, 3, 19

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.,* 989 F.3d 1002 (Fed. Cir. 2021).................... 4

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001) ............................................ 24

*Southwall Technologies, Inc. v. Cardinal IG Company*,     54 F.3d 1570 (Fed. Cir., 1995) ....... 25

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335 (Fed. Cir. 2015) ............................... 6, 20

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576 (Fed. Cir. 1996) ........................................ 19

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ................................... 4, 5, 6, 8

Pursuant to P.L.R. 4-5 and the Court's Patent Standing Order, Defendant NeuroPace, Inc. ("NeuroPace") submits this Responsive Claim Construction brief in support of its proposed claim constructions for U.S. Patent Nos. 7,209,787 (the "'787 patent") and 9,345,880 (the "'880 patent") asserted by Plaintiff DiLorenzo Biomedical, LLC ("Plaintiff" or "DBM").

## I.    INTRODUCTION

Plaintiff's proposed constructions are flawed because they are inconsistent with the intrinsic record, disregard statutory requirements for means-plus-function claims, and attempt to reclaim patent scope that DBM explicitly surrendered during prosecution.

DBM's repeated invocation of "plain and ordinary meaning" is a tactical evasion. Claim construction serves to resolve disputes over the scope of a claim. Here, the parties fundamentally dispute what the ordinary meaning *is*. By offering no affirmative construction, DBM asks this Court to abdicate its role and leave the jury without guidance, effectively punting legal questions of claim scope to the factfinder.

Most of the disputed terms are means-plus-function limitations, but DBM has refused to identify with specificity the structures that perform the recited functions as required by 35 U.S.C. § 112, ¶ 6. Without this specificity, the claims are indefinite.

DBM seeks to construe the claims broadly enough to cover NeuroPace's products, yet in doing so, it tries to recapture claim scope it expressly surrendered during prosecution to avoid NeuroPace's own prior art patent.

For these reasons, NeuroPace respectfully requests the Court adopt NeuroPace's proposed constructions.

## II.    LEGAL STANDARD

Claim construction is a question of law to be decided by the court. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). "[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005).  The "correct construction" is "[t]he construction

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

that stays true to the claim language and most naturally aligns with the patent's description of the invention." *Id.*

In construing disputed terms, the court looks first to the claims themselves, for "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312. Generally, the words of a claim should be given their "ordinary and customary meaning," which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312–13. In some instances, the ordinary meaning to a person of skill in the art is clear, and claim construction may involve "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

In many cases, however, the meaning of a term to a person skilled in the art will not be readily apparent, or is in dispute, and the court must look to other sources to determine the term's meaning. *Id.*; *see also O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co., Ltd.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008)("[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."); *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) (finding legal error in trial court's decision not to construe terms despite fundamental dispute between parties).

Under these circumstances, the court should consider the context in which the term is used in an asserted claim or in related claims, bearing in mind that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Philips,* 415 F.3d at 1313. Indeed, the specification is "always highly relevant" and "[u]sually dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315.

The court may also consider the patent's prosecution history, which consists of the complete record of proceedings before the United States Patent and Trademark Office ("USPTO") and includes the cited prior art references. The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

scope narrower than it otherwise would be." *Id.* at 1317.  "[A]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the actual invention that is disclosed, described and patented." *Fenner Inv., Ltd. v. Cellco P'ship,* 778 F.3d 1320, 1323 (Fed. Cir. 2015).

## III.    ARGUMENT

**A.    stimulating and recording unit constructed and arranged to generate said neural modulation signal based upon a neural response sensed by said at least one sensor in response to a previously delivered neural modulation signal ('787 patent, claim 1)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| plain and ordinary meaning | plain and ordinary meaning*<br><br>*in light of Plaintiff's agreement that the claims are directed to a closed-loop, feedback-driven system |

In light of DBM's admission that the "Asserted Patents concern closed-loop, feedback-driven neuromodulation" (ECF 48 at 1), NeuroPace agrees this limitation can be construed according to its plain and ordinary meaning.  NeuroPace's prior construction was based on its belief that DBM construed the asserted claims overbroadly to cover closed-loop systems without feedback control.

**B.    control module for adjusting said neural modulation signal based upon said neural system state ('787 patent, claim 3)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| plain and ordinary meaning<br><br>Alternatively, to the extent 35 U.S.C. § 112(6) is found to govern:<br><br>**function**: adjusting said neural modulation signal based upon said neural system state<br><br>**structure(s)**: circuitry that applies control laws based on the neural system state determination to adjust an output stage neuromodulation signal, as disclosed in | This is a means-plus-function term under pre-AIA, 35 U.S.C. 112(6) as it is defined in terms of its function.<br><br>**function**: adjusting said neural modulation signal based upon said neural system state.<br><br>**structure:** : a control circuit 72 having a summator 226 that receives as inputs a disease state reference r and a disease state estimate x and outputs a state error e to a control law circuit block 231 that receives the |

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

| various embodiments described at 12:35-13:67, Figs. 2 and 12, 16:55-20:21, 22:36-23:3, 23:47-25:6, and 35:64-39:43 | disease state estimate x as an additional input, and gain stages, control law stages, and weight stages, a summator 217, inv dyn and inv sta, the output of which is control circuit output "uc" that modulates a parameter of the stimulation waveform. |

### 1. This is a Means-Plus-Function Term

DBM's proposed construction is an improper attempt to circumvent the requirements of 35 U.S.C. § 112, ¶ 6. DBM argues the term recites a sufficiently definite structure, but Federal Circuit precedent confirms that "module" is a well-known "nonce" word – a generic placeholder that substitutes for "means" -- that, when defined solely by its function, must be construed as a means-plus-function limitation. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015) ("'[m]odule' is a well-known nonce word that can operate as a substitute for 'means' in the context of § 112, para. 6."); *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1006 (Fed. Cir. 2021) (holding "user identification module" was means-plus-function term).

The Federal Circuit's *en banc* decision in *Williamson* explicitly abandoned the "strong" presumption against § 112, ¶ 6 for claims lacking the word "means." *Williamson,* 792 F.3d at 1349. In *Williamson*, the court held that "distributed learning ***control module***" was a means-plus-function term because "module" provides no indication of structure. *Id.* at 1350. The addition of "control" to "module" does not impart structure. Rather, it's simply a functional prefix that recites what the module does rather than the physical makeup of the component. *Id.* at 1351 (the "prefix 'distributed learning control' does not impart structure into the term 'module.'"). The *Williamson* court directly addressed this issue when it found the term "distributed learning control module" was a means-plus-function term. *Id*.

Plaintiff attempts to circumvent this clear authority by arguing that "control module" somehow recites structure because "neural modulation signals" connote an electrical component to perform the recited function, imposing "some structure." (ECF 48 at 8.)  DBM's argument lacks merit because the "neural modulation signals" do not perform the control function and do not provide a POSITA with any structure for the "control module."  Moreover, DBM argued that

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

"neural modulation signal" is not limited to "electrical" signals.  (ECF 48 at 6.) It cannot have it both ways.  Even if the "neural modulation signals" are electrical, the claim term still does not recite definite structure to allow a POSITA to identify what the "control module" is or how it is structured.  Courts have routinely held terms including "control [generic term]" are means-plus-function because they, as here, act as a "black box" that does not name a particular structure but refers to any generic component capable of performing the recited function.  *See Williamson,* 792 F.3d at 1350-1351; *MTD Prods. Inc. v. Iancu,* 933 F.3d 1336, 1343 (Fed. Cir. 2019)(finding "mechanical control assembly" is means-plus-function term); *Ergo Licensing, LLC v. CareFusion 303, Inc.,* 673 F.3d 1361, 1363-1364 (Fed. Cir. 2012)(holding that "control device" was a purely functional term).

### 2.   Function and Corresponding Structure

The parties agree that the appropriate function for this element is "adjusting said neural modulation signal based upon said neural system state."  (ECF 48 at 7.)  The parties disagree on the corresponding structure that performs that function.

Structure disclosed in the specification qualifies as "corresponding structure" if the intrinsic evidence clearly links or associates that structure to the function recited in the claim. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed.Cir.2012) (*citing B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed.Cir.1997)). Even if the specification discloses corresponding structure, the disclosure must be "adequate" to achieve the claimed function. *Id.* at 1311–12.

DBM fails to identify specific structure to avoid the narrow, hardware-specific constraints of § 112 ¶ 6.  Instead, DBM vaguely defines "control module" as any "circuitry that applies control laws," modifies it with additional functional language ("to adjust an output stage neuromodulation signal"), and cites to entire figures (Figs. 2 and 12) and multiple pages of the specification (not to particular components).  (ECF 48 at 7.)  Such a construction does not adequately identify the corresponding structure and renders the entire claim indefinite.  *See Williams,* 792 F.3d at 1354; *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015).

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

While DBM proposes that "circuitry that applies control law…as disclosed in various embodiments" is the corresponding structure, the long list of citations to the specification fails to specify the circuitry or how it's structured. Indeed, most of DBM's citations are not to structure at all. For example, DBM cites 16:55-17:15 as "structure," but the text describes what the system *does* (applying control law) rather than how it's built.

DBM's citation to Figure 2 is similarly no help. Figure 2 is a block diagram for the entire "neurological control system" and DBM does not identify which components shown in Figure 2 are the claimed "control module" that performs the recited function. Figure 2 includes a block for "control circuit 72" but it is a "black box" devoid of structural detail.

Figure 12 presents a schematic of control circuit 72 from Figure 2, which is the sole location in the '787 patent detailing its structure. Despite referencing the entirety of Figure 12 in its proposed construction, DBM argues that NeuroPace's construction includes unnecessary components from Figure 12. (ECF 48 at 8.) DBM cannot refuse to identify the specific corresponding structures and then complain that NeuroPace's construction includes extraneous components. Only NeuroPace's proposed construction accurately identifies the structures recited in the '787 specification that perform the "adjusting" function.

While it's improper to import *unnecessary* structure, the Federal Circuit has held that when a specification discloses various "black box" embodiments, and only one contains a detailed structural schematic (like Figure 12 of the '787 Patent), that ***detailed version is the corresponding structure because the others are legally insufficient.*** *Noah Sys., Inc.* 675 F.3d at 1311-1312 (emphasis added). All embodiments referenced by DBM refer to the "control circuit 72." *See* '787 Pat. 12:5; 13:55-67; 14:3; 14:42; 16:55; 16:60-64; Figs. 2 and 12. There is no mention of a "control circuit" other than "control circuit 72" anywhere in the specification. "Control circuit 72," like DBM's "state machine" and "microprocessor" examples, is a "black box" devoid of structure except in Figure 12. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Technologies,* 521 F.3d 1328, 1331-1332 (Fed. Cir. 2008) (finding citation to "microprocessor" was insufficiently definite structure for "game control means"). Figure 12 is the only place the '787 patent discloses the specific structure in a way that would teach a POSITA how to perform

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

the "adjusting" function. Therefore, Figure 12 is not simply one example, it is the only disclosed structure that satisfies § 112 requirements.

Furthermore, because "control module" is a means-plus-function term, its scope is limited to the corresponding structure described in the specification. *See Williamson,* 792 F.3d at 1350-51.  DBM's reliance on *Libel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898 (Fed. Cir. 2004) is misplaced because *Libel-Flarsheim* did not involve means-plus-function claims. *Id.* The general prohibition against limiting claim scope to embodiments disclosed in the specification does not apply to means-plus-function claims where the tradeoff of defining claim terms by their function is that patentee is limited to the specific structure disclosed in the specification to perform that function.  *In re Donaldson Co., Inc.,* 16 F.3d 1189, 1195 (Fed. Cir. 1994).

DBM attempts to define the "control module" as "any control circuit" applying "control law" is a circular, functional definition that ignores the mandates of § 112 ¶ 6.  A control law" is a mathematical concept, not a structure.  While DBM cites *Micro Chemical* and *Libel-Flarsheim* to avoid the specific components of Figure 12, it fails to recognize that Figure 12 provides the only disclosed structure for performing the recited function.  DBM claims that not all components in Figure 12 are needed for the function but does not specify which ones are. DBM instead asserts that any similar control circuit is included, but this broad language lacks the specificity required by §112 ¶ 6 and would not enable a POSITA to practice the invention or understand the scope of claim 1. References to a "microprocessor" or "state machine" are also inadequate for the reasons discussed above.

Only NeuroPace's construction identifies with specificity the structure disclosed in the '787 patent to perform the claimed "adjusting" function.  DBM's assertion that "summator 226" is unnecessary is incorrect.  Without the summator, there is no structure disclosed to adjust the neural modulation signal based on multiple inputs, making it essential structure.  It is also clearly shown as part of control circuit 72 in Figure 12.   Figure 12 outlines the structure of the "control module," which includes the control circuit 72, including the summator 226 and control law block 31, which adjust the modulation signal based on the neural system state.

7

Plaintiff's attempt to claim "any control law circuit" improperly broadens the patent beyond what was actually disclosed.  (ECF 48 at 10.)  DBM's proposed construction provides no specificity regarding which circuitry or other structure from Figures 2 and 12, or the numerous citations to the specification, constitute corresponding structure for the claimed function and should be rejected.  In contrast, as DBM admits,[1] NeuroPace's proposal recites the specific structures identified in Figure 12 that perform the recited "adjusting" function.  Therefore, NeuroPace's construction should be adopted.

**C.    means for monitoring parameters that are indicative or predictive of a seizure ('787 patent, claim 7)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Governed by 35 U.S.C. § 112(6):<br><br>**function**: monitoring parameters that are indicative or predictive of a seizure<br><br>**structure(s)**:<br>electromyography (EMG) electrode array, including one or more of proximal electromyography (EMG) electrode array, enclosure-mounted EMG electrode array, distal EMG electrode array, EMG electrodes in the head or other location, and surface EMG electrodes; electroencephalography (EEG) electrode array, including one or more EEG electrodes; accelerometer array, including one or more of head-mounted accelerometer, proximal accelerometer, enclosure-mounted accelerometer, and distal accelerometer; acoustic transducer array, including one or more of head-mounted acoustic sensor, proximal acoustic sensor, enclosure-mounted acoustic sensor, and distal acoustic sensor; peripheral nerve electrode array, including one or more of proximal peripheral nerve electrode | This element is governed by 35 U.S.C. § 112(6):<br><br>**function**: monitoring parameters that are indicative or predictive of a seizure<br><br>**structure**:<br>electroencephalography (EEG) electrode array 51, including one or more of EEG electrodes 39, 40, and 41 and EEG signal processor module 234 that includes a disease state estimator 155;<br><br>intracranial recording electrode array 38, including one or more of intracranial electrodes 5 and 6 and intracranial recording electrode signal processor 238 that includes a disease state estimator 88, 104;<br><br>intracranial stimulating electrode array 37, including one or more of intracranial stimulating electrodes 1, 2, 3, and 4 and intracranial stimulating electrode signal processor 239 that includes a disease state estimator 92, 109; |

---

[1] (ECF 48 at 9 ("NeuroPace's proposed structure maps specifically and on a 1:1 basis, onto FIG. 12.").

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

| array and distal peripheral nerve electrode array; <br> intracranial recording electrode array, including one or more intracranial electrodes; <br> intracranial stimulating electrode array, including one or more intracranial stimulating electrodes. | <u>EMG electrode array 50, including one or more EMG electrodes 13, 14, 15, and an EMG signal processor 233 that includes disease state estimator 138, 195;</u>[2] <br><br> <u>accelerometer array 52 including one or more accelerometers 12, 28, 36, 33, and accelerometer signal processor 235 that includes disease state estimator 179;</u> <br><br> <u>peripheral nerve electrode array 54, and peripheral nerve electrode signal processor 237 that includes disease state estimator 194, 232;</u> <br><br> <u>acoustic transducer array 53, including one or more acoustic sensors 11, 19,, 27, 35, and acoustic signal processor 236 that includes disease state estimator 187.</u> |
|---|---|

The parties agree this claim is means-plus-function and that the function is, as recited in the claim, "means for monitoring parameters that are indicative or predictive of a seizure." (ECF 48 at 10.) The parties further agree that the corresponding structure includes various types of electrode arrays. (ECF 48 at 11.) NeuroPace agrees that EMG electrode array, accelerator array, acoustic transducer array and peripheral electrode array are also corresponding structures (added structure shown underlined above).

The parties disagree on whether the corresponding structure also includes a signal processor or disease state estimator. It does. However, before addressing this point, NeuroPace notes that the word "seizure" appears once in the '787 specification ('787 Pat. 4:1) and that the specification fails to disclose how any of the corresponding structures identified by DBM can by themselves function to indicate or predict a seizure, and more specifically, the onset of a seizure (as inherently required through the "means for delivering" element of claim 7). While the same can be said about NeuroPace's corresponding structure, NeuroPace's additional structure of signal processors and disease state estimators at least attempts to identify sufficient structure capable of performing the claimed functionality.

---

[2] Underlining denotes revisions to proposed claim constructions.

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

That said, claim 7 recites both a "means for sensing" and a "means for monitoring."  '787 Pat., cl. 7.  Under well-established Federal Circuit precedent, "we must presume that the use of different terms in the claim connotes different meanings."  *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co., KG,* 224 F.3d 1308, 1317 (Fed. Cir. 2000).  To construe "monitoring" as coextensive with "sensing" would render one of the limitations superfluous, violating the canon that claim language should be interpreted to give effect to every limitation.  *Intel Corp. v. Qualcomm Inc.,* 21 F.4th 801, 810 (Fed. Cir. 2021)("[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.").

The '787 specification discloses arrays that *sense* signals having tremor characteristics (*see* '787 Pat. 10:11-12, 30:12-21, and 32:65 – 33:20), arrays that *sense* signals having Parkinson's disease characteristics (*see* `787 Pat. 31:57 - 32-21, 33:52 – 34:17), and arrays that *sense* brain signals without identifying any associated disease characteristics (*see* `787 Pat. 25:20 - 26-17).  But "sensing" is different than "monitoring."  Sensing tremor, Parkinson's or brain activity via an array is simply the data acquisition phase – the claimed system's way of obtaining relevant sensor data.  Monitoring, however, involves additional steps.  It requires a signal processor to condition, e.g., filter noise, and process the raw data received from the array, and a disease state estimator to evaluate the data against known patterns to predict a disease state, which in the case of this element of claim 7 is a seizure.

Without the signal processor and estimator, the system is merely obtaining sensor data,, not monitoring disease parameters.  This is consistent with the '787 specification, which includes a signal processor and disease state estimator used in conjunction with each embodiment of sensor array, as shown below:

- EEG electrode array 51, electrodes and EEG signal processor module 234 that includes a disease state estimator 155 ('787 Pat. Fig. 6; 31:57-32:11);
- intracranial recording electrode array 38, including one or more of intracranial electrodes 5 and 6 and intracranial recording electrode signal processor 238 that includes a disease state estimator 88, 104 ('787 Pat. Fig. 3) ;

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

- intracranial stimulating electrode array 37, including one or more of intracranial stimulating electrodes 1, 2, 3, and 4 and intracranial stimulating electrode signal processor 239 that includes a disease state estimator 92, 109 (Fig. 3);

- EMG electrode array 50, including disease state estimator 138, 195 ('787 Pat. 14:26-40, Fig. 11);

- accelerometer array 52, disease state estimator 179 ('787 Pat. Fig. 7; 33:40-43);

- peripheral nerve electrode 54, disease state estimator 194, 232 ('787 Pat. 36:14-23);

- acoustic transducer array 53, disease state estimator 187 ('787 Pat. Fig. 8).

DBM's proposed construction is incorrect because it fails to include the signal processor and disease state estimators. DBM's citation to 14:26-35 of the '787 patent discusses various sensor arrays but omits the signal processor and disease state estimator recited later in the paragraph that is necessary to perform the monitoring function. '787 Pat. 14:26-43. The specification makes it clear that the disease state estimator and signal processor are essential structure, in addition to the sensor arrays, to perform the monitoring function. '787 Pat. 23:5-9 ("signal processor 71 includes a disease state estimator module array 229 that includes one or more signal processor modules that generate a quantitative estimate of at least one disease state or parameter thereof based upon its respective input.").

The various arrays are "sensors" and, as detailed above, the first part of "monitoring" the tremors over time to predict the disease state. A POSITA reading the '787 patent would understand the disease state estimator and signal processor are necessary structures to perform the recited function of monitoring parameters that indicate or predict a seizure. *See* '787 Pat. at 14:26-43. Merely sensing through one of the arrays cannot alone indicate or predict a seizure. The sensor signal must be processed to obtain a parameter and that parameter must be compared to some baseline. 787 Pat. 14:26-35, 14:36-40 ("Changes in these and other parameters are compared to current levels of, and changes in, treatment parameters. These changes are then used by aggregate disease state estimator 195 to estimate the response to therapy").

11

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

**D.    controller means for modulating parameters of a subsequent neural modulation signal based on the sensed neural response to a previously delivered neural modulation signal ('787 patent, claim 7)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Governed by 35 U.S.C. § 112(6):<br><br>**function**: modulating parameters of a subsequent neural modulation signal based on the sensed neural response to a previously delivered neural modulation signal<br><br>**structure(s)**: circuitry that applies control laws based on the sensed neural response to adjust an output stage neuromodulation signal, as disclosed in various embodiments described at 12:35-13:67, Figs. 2 and 12, 16:55-20:21, 22:36-23:3, 23:47-25:6, and 35:64-39:43 | This is a means-plus-function term under pre-AIA, 35 U.S.C. 112(6) as it is defined in terms of its function.<br><br>**function**:   modulating parameters of a subsequent neural modulation signal based on the sensed neural response to a previously delivered neural modulation signal<br><br>**structure:** : a control circuit 72 having a summator 226 that receives as inputs a disease state reference r and a disease state estimate x and outputs a state error e to a control law circuit block 231 that receives the disease state estimate x as an additional input, and gain stages, control law stages, and weight stages, a summator 217, inv dyn and inv sta, the output of which is control circuit output "uc" that modulates a parameter of the stimulation waveform. |

The parties agree that this is a means-plus-function term and that the function is as recited in the claim.  The corresponding structure is the same as that discussed above for "controller module" in claim 3 and NeuroPace's proposed construction should be adopted for the same reasons.

**E.    signal processing means for processing said conditioned sensed neural response signals to determine neural system states ('787 patent, claim 8)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Governed by 35 U.S.C. § 112(6):<br><br>function: processing said conditioned sensed neural response signals to determine neural system states<br><br>structure(s): any of EMG signal processor, EEG signal processor module, accelerometer signal processor, acoustic signal processor, peripheral nerve electrode (PNE) signal processor, | This element is governed by 35 U.S.C. § 112(6):<br><br>function: processing said conditioned sensed neural response signals to determine neural system states<br><br>structure:<br>signal processor 71, including one or more of: |

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

| | |
|---|---|
| intracranial recording electrode signal processor, intracranial stimulating electrode signal processor and a disease state estimator that extracts and aggregates specified signal features, in the respective signal processor(s) and/or in an aggregate disease state estimator. | EEG signal processor module 234 that includes an EEG disease state estimator 155; <br><br> intracranial recording electrode signal processor 238 that includes a disease state estimator 88, 104; <br><br> intracranial stimulating electrode signal processor 239 that includes a disease state estimator 92, 109; <br><br> <u>EMG signal processor 233 that includes a disease state estimator 138, 155;</u> <br><br> <u>accelerometer signal processor 235 that includes an acceleration-based disease state estimator 179;</u> <br><br> <u>acoustic signal processor 236 that includes an acoustic-based disease state estimator 187; and</u> <br><br> <u>PNE signal processor 237 that includes a PNE-based disease state estimator 194, 232.</u> <br><br> <u>In addition to one or more of the above, signal processor 71 may have an aggregate disease state estimator 195.</u> |

The parties agree this is a means-plus-function term and the function is as recited in the claim.  The parties also appear to agree on most of the corresponding structure, but DBM's construction fails to identify the components with specificity as required by § 112 ¶ 6.  In addition, DBM argues that the individual disease state estimators do not have to be included in every signal processor module because one embodiment disclosed in the specification shows an "aggregate disease state estimator 195."  That one embodiment, however, does not disclose an "aggregate disease state estimator 195" in isolation but instead in conjunction with one or more individual disease state estimators. *See* '787 Pat. 23:42-46 and figure 10, where each of the X outputs is a disease state estimate determined by a disease state estimator of a different signal processor.  *See also,* '787 Pat. at 32:9-11 (EEG disease state estimator 155); 33:40-43 (acceleration-based disease state estimator 179); 33:52-67 (acoustic-based disease state estimator 187); 36:24-34 (PNE-based disease state estimator 194, 232).

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

From this, a POSITA reading the '787 patent would understand that individual disease state estimators are required for each type of sensor array, and in some embodiments an aggregate disease state estimator 195 may be included to provide one or more disease state estimates based on the disease state estimates it receives.

While DBM may argue in its Reply that NeuroPace's proposed structure for "means for sensing" is substantially identical to the corresponding structure for "means for monitoring parameters that are indicative or predictive of a seizure," this does not violate any claim construction principle. Federal Circuit authority confirms that multiple means-plus-function limitations can share the same corresponding structure without violating the doctrine of claim differentiation, provided the limitations recite distinct functions. *See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1313 (Fed. Cir. 2001)("[i]t is settled law, however, that independent claims containing means-plus-function limitations do not have the same literal scope as dependent claims reciting specifically the structure that performs the stated function)(*citing Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1538 (Fed.Cir.1991) ("In any event, [the independent and dependent claims] do not ... thereby have exactly the same scope and, thus, claim differentiation is maintained.")).

### F.     sympathetic nervous system ('880 patent, claim 59)

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| plain and ordinary meaning | an arrangement of nerve structures that originate in the thoracic and lumbar regions of the spine and extend to muscles or organs. The sympathetic nervous system excludes nerve structures of the central nervous system, including the brain.<br><br>NeuroPace's proposed claim construction is consistent with the plain and ordinary meaning for this term as understood by a person of ordinary skill in the art ("POSA") at the time of the invention. |

DBM argues "that a judicial attempt to construe this term in neither necessary nor appropriate" because it "is a basic feature of anatomy well known to those of skill in the art."

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

(ECF 48 at 15.) However, in section G *infra,* DBM asserts the term "component of the sympathetic nervous system" has an entirely different meaning than "sympathetic nervous system." (ECF 48 at 16.) To wit, DBM proposes defining "component of the sympathetic nervous system" as "any component or structure comprising an entirety or portion of the sympathetic nervous system, or any structure interfaced thereto."

Parsing this proposed definition into alternatives, in one alternative a "component of the sympathetic nervous system" is "any component or structure comprising an <u>entirety</u> of the sympathetic nervous system." In other words, a component of the sympathetic nervous system is also the entirety of the sympathetic nervous system, rendering the "component" term superfluous with "sympathetic nervous system." This clearly contradicts DBM's statement that the term "component of the sympathetic nervous system" is distinct from "sympathetic nervous system" and violates the tenets of claim construction. *Intel Corp.,* 21 F.4th at 810 ("[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."). Because of this, it is imperative that the Court construe the term "sympathetic nervous system" in isolation.

Furthermore, there is no reason DBM should object to NeuroPace's construction of "sympathetic nervous system," which is the plain and ordinary meaning, as it admits there would be no material disagreement. (ECF 48 at 15.)

The prosecution history also supports NeuroPace's proposed construction, including the exclusion component, i.e., "the sympathetic nervous system excludes nerve structures of the central nervous system, including the brain." The file history includes statements DBM made during previous litigation involving the '880 patent in which DBM admitted that the central nervous system and peripheral nervous system are distinct. *See* Bacani Decl. Ex. 4 at DMB_NP_0004787 ("The relevant hierarchy of the nervous system is that it comprises the central nervous system (brain, spinal cord) and the peripheral nervous system."). In addition, as detailed in Section F and G *infra*, DBM overcame the USPTO's rejection of the asserted claim over NeuroPace's '299 patent by arguing that NeuroPace's patent did not disclose stimulating the *sympathetic* nervous system. Having distinguished NeuroPace's '299 patent on the ground

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

that it fails to disclose stimulating the sympathetic nervous system, DBM cannot now recapture stimulation methods that lack this specific feature. A clear and unmistakable surrender occurred when DBM relied on this distinction to secure allowance from the USPTO. *See Amgen Inc. v. Coherus Biosciences Inc.,* 931 F.3d 1154, 1159-61 (Fed. Cir. 2019). This argument-based estoppel applies regardless of whether it was required for patentability. *Id.* ("clear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may also create an estoppel").

Thus, NeuroPace requests the Court define "sympathetic nervous system" to be "an arrangement of nerve structures that originate in the thoracic and lumbar regions of the spine and extend to muscles or organs." This definition is supported by DBM's prior litigation statements and by extrinsic dictionary definitions showing how a POSITA would understand the term.

**G.    neural state of a component of the sympathetic nervous system ('880 patent, claim 59)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| component of the sympathetic nervous system": any component or structure comprising an entirety or portion of the sympathetic nervous system, or any structure interfaced thereto.<br><br>In all other respects: plain and ordinary meaning. | a nerve structure that is part of the sympathetic nervous system" (where "sympathetic nervous system" is defined as proposed by NeuroPace in section F)<br><br>"neural state" is a calculation representative of affect, which calculation is derived from a sensed signal, sensed without the use of electrodes configured for implant in the brain |

In view of DBM's new definition for this term, NeuroPace is compelled to modify its proposed definition into two parts, as shown above. Considering part one, DBM's proposed definition of a "a component of the sympathetic nervous system" is overly broad in view of prosecution history estoppel. It is also indefinite.

During prosecution, DBM presented arguments to the USPTO to distinguish its claims over U.S. Pat. No. 6,354,299, inventor Fischell, assigned to NeuroPace ("NeuroPace '299 Pat."). In doing so, DBM created argument-based estoppel that severely limits the scope of various elements of claim 59. *See Amgen Inc,* 931 F.3d at 1159-61.

In an Office Action issued June 12, 2009, the USPTO rejected claims 1-24 and 37-45 based on NeuroPace '299. Bacani Decl. Ex. 1 at DBM_NP0005039. In a response filed December 6, 2009, DBM argued the claims were patentable over NeuroPace '299 because:

> Fischell describes <u>a system which is entirely contained within the cranium</u>. This is detailed in Column 6, Lines 33-48. As such, <u>Fischell 6,354,299 does not anticipate electrode placement outside the calvarum</u>. This is reinforced in the subsequent paragraph, Column 6, Lines 49-51, stating "[Fischell] also envisions the utilization of an intracranial system for the treatment of certain diseases without placing wires through the neck." Placement in the calvarum adjacent to a seizure focus is mentioned. Seizures are not known to originate in the cerebellum, brainstem, or from an extracranial location.
>
> Hence <u>Fischell 6,354,299 does not teach electrodes being placed in an extracranial location</u>. Though Fischell 6,354,299 mentions but does not describe nor teach actuators on the vagus nerve, <u>he does not teach any electrode designs which would accomplish this,</u> nor does he describe how this would be accomplished without employing wires which would traversing the neck, not does he teach any wireless method or apparatus for performing this function.
>
> Bacani Decl., Ex. 2 at DBM_NP_0005025 (emphasis added).

DBM overcame NeuroPace `299 by arguing that the intracranial anatomy disclosed in NeuroPace `299 does not correspond to the sympathetic nervous system nor of the multiplicity of sympathetic structures. Thus, by this argument, DBM surrendered this anatomy from the scope of "components of the sympathetic nervous system." Now, DBM attempts to recapture this excluded anatomy under the guise of lexicography. However, it is well settled that statements made during prosecution can narrow the scope of the claim. *See Phillips,* 415 F.3d at 1315 ("[i]diosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification" but "[s]uch understanding is informed, as needed, by the prosecution history."); at 1317 ("the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed. Cir. 1996)("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.")(citations omitted). Thus, despite the

oxymoronic lexicographic definitions included in the `880 patent highlighted in DBM's Opening Claim Construction brief and DBM's attempt to gloss over argument-based estoppel, the fact remains that DBM surrendered brain tissue from the definition of "sympathetic nervous system" and "components of the sympathetic nervous system" to get around NeuroPace's prior art and that subject matter cannot be recaptured.

As for claim 32 (filed claim 21) relied upon by DBM in its Opening Claim Construction brief, this claim resulted from a significant amendment to claim 21 filed by DBM on May 16, 2010 – almost four years after filing the application. *See* Bacani Decl. Ex. 3 at DBM_NP_0004962. It is a blatant introduction of a new lexicography (and new matter) introduced by DBM and casts doubt on the priority date and DBM's conduct during prosecution.

Regarding the confusion and ambiguity of DBM's proposed definition, as mentioned in Section F, *supra*, parsing DBM's proposed definition into its alternatives, in one alternative "component of the sympathetic nervous system" is "any component or structure comprising an entirety of the sympathetic nervous system." In another alternative, "component of the sympathetic nervous system" is "any component or structure comprising [a] portion of the sympathetic nervous system." In yet another alternative, "component of the sympathetic nervous system" is "any structure interfaced thereto," where one is left to wonder what "interfaced thereto" means. A POSITA reading the specification would not understand whether the "interfaced thereto" requires a direct interface or allows an indirect interface. If it means the latter, then DBM's definition in effect encompasses the entirety of the nervous system, i.e., the brain is connected to the spinal cord, the spinal cord is connected to peripheral nervous system. They all directly/indirectly interface. This is an impermissibly broad definition by DBM and renders the entire claim indefinite.

In summary, DBM's proposed definition attempts to recapture subject matter surrendered during prosecution and should be discarded on that basis alone. Furthermore, it is vague and ambiguous, and thus indefinite under U.S. patent law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015).

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

NeuroPace proposes to simply define "a component of the sympathetic nervous system" as "a nerve structure that is part of the sympathetic nervous system." This definition is a version of the definition proposed by DBM – but modified to provide clarity and account for DBM's argument-based estoppel.

Regarding "neural state," DBM proposes a plain and ordinary meaning for this part of the claim element. However, there is nothing ordinary about "neural state" as recited in claim 59. To put the term in context, claim 59 recites: "C. a signal processor, configured to estimate *the neural state* of a component of the sympathetic nervous system, *said neural state* is representative of affect."

The `880 patent does not explicitly define "neural state" and the term appears only once in the written description. '787 pat. 36:48. Thus, looking for written description and enablement (as required under 35 U.S.C. §112), one must resort to the claims. From claim 59, and other claims, it appears a "neural state" is something that is calculated (see claims 5-14), relates to or is representative of affect (see claims 5-8, and 11-14), and is used to generate a signal (see claims 17-23). Furthermore, considering claim 59 in its entirety, it is inherent from the "electronic communications" recited in claim 59 that the signal conditioning circuit receives something from the sensor array (logically a "sensed signal"), and communicates a conditioned version of the sensed signal to the signal processor, and the signal processor uses this conditioned sensed signal to estimate a neural state. While this exchange is not explicitly recited in claim 59, in order to be valid, claim 59 must be interpreted this way. Otherwise, the lack of essential connection between the elements of claim 59 would render the claim indefinite under 35 U.S.C. §112.  Also, the claim would have no utility as required under 35 U.S.C. §101.

NeuroPace appreciates that limitations from the specification should not be read into the claims. However, terms without a plain and ordinary meaning, such as "neural state," require construction. Furthermore, in view of the argument-based estoppel, the term should be construed in a way that excludes the surrendered subject matter.  Thus, NeuroPace requests the Court define "neural state" as "a calculation representative of affect, which calculation is derived from a sensed signal, sensed without the use of electrodes configured for implant in the brain."

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

### H.    representative of affect ('880 patent, claim 59)

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| plain and ordinary meaning | a calculated neural state that represents affect, where the neural state calculation is made without use of EEG signals |

DBM proposes a plain and ordinary meaning for "affect" and distinguishes "affect" from "affective disorder" in its Opening Claim Construction brief.  However, the term in dispute is "*representative of* affect" and there is nothing plain and ordinary about it. To put the term in context, claim 59 recites: "a signal processor, configured to estimate the neural state of a component of the sympathetic nervous system, said neural state is *representative of affect*."

The `880 patent does not explicitly define "representative of affect" and the term does not appear in the written description. Thus, looking for written description and enablement (as required under 35 U.S.C. §112), one must resort to the claims. From claims 27, 28, 29 it appears "representative of affect" is a calculated neural state that represents affect.

The prosecution history is also relevant to construction of this term.  In the response filed on December 6, 2009, DBM amended and separately argued claim 44 (asserted claim 59) was patentable over NeuroPace `299 because:

> Regarding claims 41-45, these are distinct from apparatus mentioned in the Fischell 6,354,299 device. (A) Fischell does not teach, and to applicant's knowledge, <u>EEG signals are not known to contain information reflective of affect</u>. Furthermore, electrodes configured for recording from a seizure focus would likely be <u>inappropriate, ineffective, and potentially unsafe form implantation into many sympathetic structures</u>. …. (F) Fischell does not mention sympathetic structures taught and claimed in the present invention and, as such, electrodes configured for hippocampus stimulation would likely be inappropriate, ineffective, and unsafe if one attempted to implant them in the locus ceruleus or other sympathetic target.

Bacani Dec. Ex. 2 at DBM_NP_0005020, 0005025) (emphasis added).

Here DBM overcame NeuroPace `299 arguing that the EEG signals sensed by the electrodes disclosed in NeuroPace `299 do not contain information reflective of affect. Thus, DBM surrendered use of EEG signals from the scope of claims involving neural states "representative of affect."

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

As detailed above, DBM also overcame NeuroPace `299 arguing that the electrodes disclosed in NeuroPace `299 for seizure detection are inappropriate, ineffective, and potentially unsafe for implantation into many sympathetic structures. In other words, while the electrodes disclosed in NeuroPace `299 are configured for implant in the brain, they are not configured for interfacing the sympathetic nervous system. Therefore, DBM surrendered electrodes configured for implant in the brain from the scope of claims involving "neural state of a component of the sympathetic nervous system."

NeuroPace appreciates that limitations from the specification should not be read into the claims. However, terms without a plain and ordinary meaning, such as "representative of affect, require construction.  Furthermore, in view of the argument-based estoppel, it is necessary to define "representative of affect" in a way that excludes the surrendered subject matter. Therefore, NeuroPace requests the Court define "representative of affect" to mean "a calculated neural state that represents affect, where the neural state calculation is made without use of EEG signals."

## I.    configured to generate a signal to modulate affect ('880 patent, claim 59)

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| plain and ordinary meaning | configured to generate an electrical stimulation signal having parameters that alter a state of affect.<br><br>A signal to modulate affect excludes signals that reduce seizure activity. |

NeuroPace's proposed construction is consistent with the plain and ordinary meaning. While DBM purports to propose the plain and ordinary meaning, the parties have a genuine dispute regarding what the ordinary meaning is and, therefore, it should be construed.

The `880 patent does not explicitly define "a signal to modulate affect" and the term does not appear in the written description. Thus, looking for written description and enablement (as required under 35 U.S.C. §112) for a "a signal to modulate affect", one must resort to the claims. However, only claims 58 and 59 recite a signal to modulate affect, and neither of them elucidate

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

the term. Considering other claims, some disclose modulating via electrical stimulation to treat affective disorders. *See* claims 37-48. But, according to DBM, "affect" is distinct from "affective disorders," so these claims do not provide a written description for, or enablement of, "a signal to modulate affect." Thus, as a fundamental matter, "a signal to modulate affect" is indefinite, which renders claim 59 invalid.

The prosecution history is also relevant to this term. In its December 6, 2009 response to the USPTO's Office Action, DBM overcame NeuroPace `299 by arguing NeuroPace '299 discloses a system that generates signals that modulate the epileptic focus, thalamus, hippocampus to reduce seizure activity – as opposed to DBM's claimed system that generates a signal that modulates the ***sympathetic nervous system*** to modulate ***affect***. Bacani Decl., Ex. 2 at DBM_NP_0005025. Thus, DBM surrendered signals that modulate seizure activity from the scope of "configured to generate a signal to modulate affect."

NeuroPace proposes defining "configured to generate a signal to modulate affect" as "configured to generate an electrical stimulation signal having parameters that alter a state of affect. A signal to modulate affect excludes signals that reduce seizure activity." The exclusion language of this definition is appropriate to define "a signal to modulate affect" to exclude the surrendered subject matter.

Regarding NeuroPace's original proposed definition, DBM argues that the plain language of claim 59 does not require the delivery of a signal to modulate affect. NeuroPace has revised its proposed definition to remove the delivery aspect.

**J.    a stimulating electrode array configured to interface with a component of the sympathetic nervous system ('880 patent, claim 59)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| component of the sympathetic nervous system: any component or structure comprising an entirety or portion of the sympathetic nervous system, or any structure interfaced thereto.<br><br>In all other respects: plain and ordinary meaning. | one or more electrodes having a structural configuration that enables interfacing with components of the sympathetic nervous system.<br><br>Excludes electrodes that are configured only for intracranial implant on or adjacent to a seizure focus. |

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

DBM proposes a plain and ordinary meaning for "a stimulating electrode array configured to interface." However, in view of the argument-based estoppel relevant to this term, it is necessary to define the "stimulating electrode array" to specifically exclude the surrendered subject matter. Thus, NeuroPace proposes excluding "electrodes that are configured only for intracranial implant on or adjacent to a seizure focus" from the definition of "a stimulating electrode array."

The "component of the sympathetic nervous system" portion of this term should be defined the same as it is in Section G, *supra*. A "claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *see also, Southwall Technologies, Inc. v. Cardinal IG Company*, 54 F.3d 1570, 1579 (Fed. Cir. 1995); *American Permahedge, Inc. v. Barcana, Inc.*, 105 F.3d 1441, 1446 (Fed. Cir. 1997).

Regarding a "plurality of electrodes," NeuroPace is fine with DBM's proposal that the "array" mean one or more and reflects that agreement with underlined language above.

## IV.   CONCLUSION

For the foregoing reasons, Defendant respectfully requests the Court adopt NeuroPace's proposed claim constructions.

Dated:  April 27, 2026                     LOZA & LOZA, LLP

                                          By: /s/ *Lena Bacani*
                                          _____
                                               Lena N. Bacani (SBN 213556)

                                          Attorneys for Defendant
                                          NEUROPACE, INC.

23

NEUROPACE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF